The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Oyez! Oyez! Oyez! All persons having any manner or form of business before the Honorable, the United States Court of Appeals for the Fourth Circuit, are admonished to draw nigh and give their attention, for the Court is now sitting. God save the United States and this Honorable Court. Good morning. Please be seated. We're ready for argument in Brickey v. Hall. Mr. Carroll. Good morning. Good morning. Please proceed. May it please the Court, Jeremy Carroll on behalf of the defendant and appellant, former Chief Robb Hall of the Saltville Police Department. Your Honor, this is an appeal, obviously, of a First Amendment retaliation claim, raising issues of qualified immunity. And the specific issues before the Court are whether it's clearly established that Mr. Brickey was speaking as a citizen on a matter of public concern. And if so, whether his interest in that speech was clearly established to outweigh the interests of the town in having effective and efficient operations of its police department. Before delving into those issues, I did want to comment, however, first on the recent Supreme Court case, Mulinex v. Luna. While that case is a Fourth Amendment use of force case, it does have some instructive comments with regard to the application of qualified immunity that we believe, we respectfully submit, would apply even to a First Amendment retaliation case. In Mulinex, the Court first reiterated the longstanding principle that it really is a difficult, a high bar to overcome a qualified immunity defense, Your Honor. The Court reiterated that the clearly established right must be sufficiently clear that every reasonable official would have understood what he was doing violated the right, and that existing precedent must put the constitutional question beyond debate. And respectfully, as I'll address in the issues, that standard is not met here. But perhaps more importantly, the Mulinex case, Your Honor, stressed the importance of defining the right at issue with a particular level of detail that, again, we would submit the district court in this case did not do. The Mulinex court eschewed a definition of a right at a high level of generality and said the courts must focus on the particular conduct that's alleged to violate a right. Mr. Carroll. Yes, ma'am. Yes, Your Honor. Mr. Brickey was a former police officer. He was a police. But when he was, was he a police officer when he was running? Yes, Your Honor. He was an active member, a sworn law enforcement officer of the Saltville Police Department. And could you elaborate just a little bit on the nature of your concern and with some degree of specificity about the safe and effective functioning of the police force? Yes, Your Honor. As the case law at length establishes, a police department is a paramilitary organization, and discipline is paramount in that organization. The case has recognized that where discipline is demanded, officers in that police department necessarily give up some degree of freedom. In this case, you have a police officer who is going out and saying that the police department, of which he is a sworn officer, needs to be more professional. That was already in the, I mean, that was in the public record. There was no surprise about that. So I'm not sure what his comments add to the debate. I'm not sure. Well, there was the issue of the reputation of the department, Judge Diaz. That is certainly correct. I would draw a distinction, however, between, let me answer that question in two ways. When Chief Hall in the squad room says we need to go out and be more professional to his officers, that's a paramilitary organization. That's a command order. When one of those officers goes out in the public and questions the professionalism of the department, that, respectfully, we submit impairs the efficiency and the effectiveness. Well, but the chief himself has indicated that there's a need to increase professionalism. So how is Bricky's comments inconsistent with that? It's inconsistent only because, again, the paramilitary organization has the chain of command. And if the chief, and the chief I don't believe is saying it that publicly in the newspaper. He's talking about it to his officers in the squad. Well, but wasn't there evidence in the record that that was a problem of a public, that was known in the public arena? There certainly was some officer misconduct that predated Chief Hall. And there certainly was some financial misconduct that predated Chief Hall. And those issues the district court, respectfully, saw as just they were already in the public domain. And so, therefore, speech on those issues didn't matter. We submit, particularly in light of Muellen, Your Honor, that the court needs to consider those factors as part of the specific context of this case. Not that this information was already in the public domain, but rather the context of this case is, yes, he's speaking during a campaign as a town council candidate. But he's also speaking as a sworn law enforcement officer of a police department. He's speaking with regard to a police department that is trying, striving, and Judge Conrad even finds this in his opinion, to overcome its tarnished reputation. And when his speech sets back those efforts to improve that reputation. It's not entirely clear to me, though. To say that it needs to be more aggressive on investigations, that's a, it's a, it's a generality. It's, it's not even exactly saying that they're not aggressive. It's simply saying that, that a better job could be done. I'm having a little trouble seeing how it sets back the efforts, efforts to encourage a greater degree of professionalism. Which I thought was a common interest, actually. It is a common interest to be professional, absolutely. Your Honor, when the effort is being made to improve the professionalism, the reputation of the department. These types of comments, I know the plaintiff refers to them as innocuous. These types of comments, excuse me, do, do set that back. Because you have a police officer, a line officer saying that, you know, the flip side of that comment is we are not being professional enough. We are not aggressively investigating crimes. And in particular, we're not investigating drug crimes, which we know we have a drug problem. But that's different, respectfully, than saying we're not investigating drug crimes. And Garcetti has an interesting line that touches on this issue. When it's discussing balancing, it speaks in terms of certain public officials are going to have a particular place where their comments are going to be given weight. And that can undermine or impair the effective and efficiency of the, of the operation. Judge Conrad, I think, dealt, it seems to me, sufficiently with the comments regarding professionalism and the need for additional emphasis on drug crime prevention. The comment that concerns me, and I think may be your strongest argument in favor of qualified immunity, is this issue with respect to the mishandling of public funds. As you know, there's a line of cases that suggest that public officials are well within their rights generally to disclose serious misconduct. And so the question is, how do you categorize what Bricky alleged happened here? Was it serious misconduct or was it simply an attack on the chief's handling of the public fisc? Well, it was certainly false to begin with. And because the record reflects, the supplies had been ordered and paid for approximately a month before this article was published. So it's a reckless and false statement. It is not serious misconduct because, it does not refer to serious misconduct because, again, it wasn't true. The materials had been ordered, the materials had been paid for. And so it doesn't fall within the Durham and more recently, as the judge knows, the town of Mocksville case, which did involve serious misconduct. But it does, it's not as innocuous as the plaintiff would have you to believe. You're, again, looking at the specific context of the case as Mulinax directs. You have this tarnished reputation of the police department. You have the efforts to improve that tarnished reputation. One of those issues that predated Chief Hall was financial management. And you have a false and reckless statement that is made in the media that undermines the effort to improve that. The statement's a little bit ambiguous because he seems to be attacking the city council as opposed to the chief. He certainly comes around at the end of the statement. You're certainly correct, Your Honor, and says this shows mismanagement at the council level. But it's the other misuse of taxpayer funds that's earlier in that quote that reflects back on his comments about Chief Hall. And if you read in the entirety, he makes this reference to funds, their funds being spent on other matters when the record reflects it was their slash community relations and the money was spent on community relations items and that there was money in the account. And then you take that forward and he calls it other misuse, but it's false and reckless. And we know from Lane, for example, where falsity was relevant. We know from a number of cases that falsity is relevant in the balancing test. Respectfully, the falsity here undermines the interest he has in the speech and also impairs the effectiveness and the efficiency of the governmental operations of the police department. I don't know if I'm fully responding to your question, Your Honor, but it is not, to go back to the heart of your initial question, this is not a Durham or Mocksville case, but this is a case where the speech is kind of in that sweet spot. You say it's not a Durham or Mocksville case because of the amount of money involved or the language that was used? The language, the absence of accusations of serious misconduct or corruption, Your Honor. But it does, the comments do raise the issue of mismanagement and falsely so. And what's also important here is the role of Dr. Reynolds in this report. His role, as I see it, one of the more important functions he served was he, before the termination decision was made, uncovered the fact that these statements about misuse of funds were false. Mr. Brickey admitted to Dr. Reynolds, yes, I mean, I should have said something else. I mean, it certainly wasn't misuse. I'm not accusing anybody of misconduct or criminal conduct. And so, and Dr. Reynolds conveyed that to Chief Hall. So when Chief Hall made the termination decision, he knew it didn't rise to the level of serious misconduct. He knew that it impaired the effective and efficient operations of the police department, but it didn't fall into the Durham or now the Mocksville. Wouldn't one response with respect to that, to those allegations about the DARE fund be that the answer is more speech? You simply explain it. I'll harken back to an old Fourth Circuit case called Piver, Your Honor. And in that case, there's some discussion, and this language comes up in a number of cases. I just happened to run across it in that case. Where false accusations are made which are difficult for somebody to disprove, that is relevant to this balancing test. And here we have those exact types of false accusations. You could have had more speech. And perhaps in an educational or academic context, that would be the answer. But here, we're in the police department, the paramilitary organization, where you must demand discipline, where you have to have harmony, and where you have to have, where you do have close working relationships, particularly in this very small department. And so more speech, I suppose, sounds good, but I don't think it's effective when you have, again, the tarnished reputation. But given the fact that public employees do have a right to expose misconduct, does the First Amendment analysis turn on whether the speech is true or false? I don't believe it does, frankly, with respect to whether it's on a matter of public concern, Your Honor. I think in the Fourth Circuit, false speech can be protected speech. Right. That was my point. For purposes of our analysis, does it matter? I think it matters when you get to the balancing test, Your Honor. And Lane, for example, when Lane – The balancing of whether or not it impairs the safe and effective operation of the office? That wouldn't seem to come into play there as much. Sorry. Balancing the interests of the Mr. Bricky had in his speech. When it's demonstrated to be false and reckless speech, I think, respectfully, that reduces his interest, versus the government's interest in efficient and effective operations of its police department. In the specific context, back to Mule and Axe, I fear I'm going on about that, but in that specific context where you're trying to improve the department's reputation respectfully, and the subject matter here about financial mismanagement, falsity is very relevant and almost overriding with respect to the balancing test. But I do agree with Your Honor that with regard to the public concern issue, falsity doesn't come into play there, but it does diminish the interest in the speech. You – I mean, I suppose one can say that any time you have a balancing test, as we have in this case, you're not suggesting that simply because of the existence of a balancing test, the official seeking qualified immunity always wins because, I mean, every case is sui generis and distinct on its facts? Not always wins, but I think this Court has recognized, and I'll refer to the Stickley case in 2011, which we cited in our brief, Your Honor, that where there's no demonstrable interest for the employer is when the employee wins. It is an outlier case, was the language in that opinion, where everyone – kind of harkens back to Mule and Axe as well – where every reasonable official would know that the action violated the law. It is such a high standard, though it's not every case, but it tends to be the case like Lane or like Smith v. Gilchrist where the employer's side of the ledger was empty. And this is not one of those cases where the employer's side of the ledger is empty, respectfully, whether it's the DARE comments and their impact on the efforts to improve the reputation or whether it's the professionalism comments or the investigative comments, which draw this notion that – and Judge Cottenright said, well, everybody knew there were drug problems. Yes, but that's different than a police officer – and I go back to that Garcetti quote about a person's role in the government in giving weight to the comments – a police officer saying that the police department is not adequately investigating drug crimes or a police officer saying that the police department is not sufficiently professional. Respectfully, I believe those do impair the effective and efficient operation of the government and would respectfully request that the Court overturn Judge Cottenright's decision and enter judgment for Mr. Bricky. I see my time has expired. Do you have some time reserved for rebuttal? Yes, ma'am. Yes, Your Honor. Thank you very much. Mr. McNeil? Yes, Your Honor. Good morning, Your Honors, and may it please the Court. My name is Kyle McNeil. I represent Randall Bricky, the appellee in this case. I'm going to jump around a little bit to try to address some of the questions that were posed, starting with the Dare comment. First, again, I think it should be taken in context, is what he said was, I went to Chief Hall and asked where the funds are to buy these supplies, and Chief Hall said, told him, they aren't there. The record is clear that that, or the record, there is evidence in the record that that happened, and that Chief Hall never said, hey, I already bought these things. And so that's when, that is the entirety of Chief Hall's involvement in this little vignette. Then Bricky goes to the town clerk and tries to get the receipts. Things don't match up. And that's why he says, I think we need to have better management at the council level to make sure that everyone knows what's going on with the money. At the very most, or at the very least, people aren't on the same page about money around here. Well, that's a little, that's somewhat sanitized. The council level, at least as I understood it, didn't get implicated until the very end. The focus was on his being shown invoices by the accounts payable clerk that were charged to the DARE account but didn't have anything to do, he says, with the DARE program. Yes, Your Honor, and that's the accounts payable clerk. That's not the police department. Okay, that's a different, okay, all right. The accounts payable clerk is with the town. And so criticizing the accounts payable clerk could never possibly affect the efficient operation of the police department. And that's the next point I want to turn to is you have to look at, okay, well, what was the effect of this comment? What was the actual or reasonably apprehended effect of this comment? And my friend on the other side keeps talking about impairing the effective and efficient operation of the police force. I never heard how. I never heard how this could impair the effective and efficient operation of the police force other than reputational harm. It brings us into disrepute. Well, the point was also made that it could create disharmony within a unit that functions effectively when it functions cohesively, I think was the point. Sure, and at a broad point, that is, there is a theoretical possibility. The point is that the case law says that it has to be more than theoretical. You have to have some basis for it to be reasonably apprehended. And as to the comments about the DARE fund, the only thing that I heard him say about the potential for harm was sort of an undermining the public trust, you know, concern. This court said in Durham v. Jones that statements that might undermine the public trust, that's not enough. That undermining the public trust doesn't get to affecting the way within the unit the unit operates. So there's no, what our position is, there's no evidence that anything that he said, which as Your Honor kind of led to, his comments weren't critical. His comments were aspirational. They were, it wasn't we're not doing any patrols. It wasn't we are not professional. It was we can do better. We can do more. And as Judge Conrad said, this was all out in the public sphere. This was a big deal in Saltville for the preceding couple of years. Chief Hall had just come in. He had been there for less than a year. So it's no one suggesting that all of the ills that he came in to cure and that everyone agrees existed had already been cured. And so there's nothing, there's nothing disruptive or critical of saying we can do more. Well, I'm not sure disruptive. I agree with you that it's not necessarily disruptive. It's a little hard to see that it wouldn't be considered critical. Yes, ma'am. Maybe a better job could be done. Okay, fair enough. I'm not sure that the analysis turns on whether it's critical. You're exactly correct, Your Honor. Fair enough. Maybe someone can construe it as being critical. The point is, is that criticism isn't enough. You have to have proof that it has changed the way the force works or could change the way the force works. You have to have proof of that? That's what this Court said I believe. Well, it has to be reasonably apprehended. Yes, or that it could change. I agree. It doesn't have to have already happened. But there has to be a reasonable basis to think that this is going to affect the inner workings of the force and not just de minimis. That's the other point is the cases are clear that as the First Amendment interests go up the scale, so too must the disruption. So this de minimis disruption, which we do not concede there's anything here about that, but even that isn't enough. It has to be some really tangible, you know, I struggle to put it into words, when the First Amendment interests are so heavy. And here there's no question the First Amendment interests are at their heaviest. Political campaign speech is the very tip of the pyramid when it comes to First Amendment protection. Mr. McNeil, is your point, going back to the Dare comments, is your argument with respect to that particular aspect of Brickey's responses to the paper's questions that it did not amount, it was an assertion or a statement with respect to potential serious misconduct, or it simply didn't implicate the chief in that misconduct? Can I have C, all of the above, as an answer, Your Honor? Because it's a little bit of both. It is, I find there's a paradox with this. Does it amount to an allegation of serious misconduct? That's what was going on in Durham, no question. They alleged serious misconduct. But the point is, is that when you allege serious misconduct, then the potential for disruption and problems within the force, that's even higher. What this officer in Durham accused not just the chief, but the entire police force, the entire force of engaging in, in terms of telling him to falsify his report and all that stuff, I mean, that's some serious stuff. Sure, but we're willing to endure that because of the larger laudable goal of public disclosure of that misconduct. Yes, and my point, Your Honor, is that, but that kind of allegation of serious misconduct has strong implications on the other side of the ledger, the potential to disrupt the force. I don't want to make a Star Trek reference or Star Wars reference here, but when it's less than that, I think what- I'm not following you at all. And I'm not saying it very well, I'm sorry. Can I back up just for a moment to Judge Diaz's question, which goes back to my question at the beginning of our discussion, and that is that when you look at the comments about the D.A.R.E. program, I read them as focusing, as alleging that the police chief was guilty, arguably, of some sort of misfeasance with respect to the D.A.R.E. funds. It just sort of flows logically to me from the text. I'm told that there was no money to place the D.A.R.E. order after checking with the accounts payable clerk to see where the $500 went, and there's no indication that Mr. Bricky asked Chief Hall about that. He goes to the accounts payable clerk and was shown items on the invoices that had nothing to do with the D.A.R.E. program. To me, that conveys the sense that there was misconduct on Chief Hall's part, taken as a whole. And it's not until the last sentence, along with other misuse, we have poor management at the council level. It sort of ties back into the office for which he's running. So it does seem, and I think you're acknowledging this, that an allegation of serious misconduct, it seems to be directed at the police officer, does weigh on the part of the police chief, does weigh in the balance if that's not an accurate charge. And so it goes back, and my long-winded question is, it goes back to what are you saying, that there wasn't an allegation of serious misconduct, or that the allegation of serious misconduct was directed toward others than the police chief? I think the intent of the allegation was not to be directed at the police chief. I agree with you. But it is serious. You can read it the other way. And so if you read it the other way. If you're conceding that, then I think you lose, don't you? No, sir, Your Honor, because if you read it the other way, if you read it as an allegation of misconduct, then you run straight into Durham, which says allegations of misconduct are protected. Hold on, but the question with respect to qualified immunity is that we protect, protection extends to all but the most seriously incompetent of officers. And if you're suggesting that there's a fine distinction to be made here in terms of reading the cases and interpreting them, then how can we put the chief in that position? I don't think there is a fine distinction, Your Honor, because I think if you characterize this as an allegation of misconduct or misuse or mismanagement, however on that scale you want to put it, then you run straight into Durham v. Jones and that line of case law that says allegations of misconduct are, there's a huge public interest in that. And so to justify, so there's a huge First Amendment interest. That weighs very heavily on the scale. To justify retaliating against someone for bringing that to light or making an issue of it, you have to have proof of either actual disruption or disruption being reasonably apprehended. Okay, there's a big difference. I'm glad you put those in the disjunctive because you don't have to have proof of disruption. I believe you do, Your Honor. I think you have to have, there has to be evidence that it was disruption. It was reasonably apprehended that disruption could occur. Yes, ma'am. Yes, ma'am. But that has to be based on some fact. It can't just be a theoretical fear. There has to be some degree of particularity. And here, their degree of particularity is based on Well, here it would be that the police chief would be subject to accusations of misfeasance, misappropriation of funds, in essence, by someone below him on the chain of command. And what Durham says is that doesn't, just the fact that he could be called in for, that there could be a reputational harm isn't enough. It's not reputational. It's harm or it's harm to the police chief's ability to maintain effective operational authority over this entity that derives a lot of its force from cohesiveness and respect for authority. And I agree with Your Honor to a point. And so the question is where in the record is there anything that you can grab onto of saying that somehow his officers, that this could affect the way he works with his officers. And that's the point is that there's nothing in the record on that. What they did is they went out and, you know, I think the timeline is relevant here. The articles were published April 25th and 26th. He gives Bricky written notice on May 4th and then he hires Dr. Reynolds. In the meantime, he goes and gets the blessing from the town council, from the three town council members that Bricky's running against to discipline this guy, discipline Bricky. So he had already made the decision at that point that he was going down this road before he gets the Reynolds report. Now, then the Reynolds report doesn't have anything about how this could, how any officers say, okay, now I think less of Chief Hall and now I'm less willing to follow him. In fact, in my opinion, the Reynolds report was more disruptive because several of the officers weren't even aware of the comments. Excuse me, Mr. McNew.  I have a question, sir. If we assume for a minute that we disagree with your position on the DARE funds, what happens to the rest of the case? Do you automatically lose? No, ma'am, Your Honor, because, again, I think you have to look at it in its entirety. Carry that forward for us, if you would. Okay. So, again, you have to look at, okay, you have to look at the speech in its entirety. I don't think you can pick it apart like this. You have to look at it in its context, in its entirety. What are the First Amendment interests in there? Are you talking about the DARE speech now? I'm talking about the articles. I'm talking about the entirety of what he said, his responses to the articles. I think you have to look at that in its entirety. What are the First Amendment interests in that, in the entirety of that speech? They are unquestionably very high. They are at their highest. And so then you have to think, you have to ask, okay, in light of that, what was the potential or actuality of disruption of the operation of this police force sufficient to overcome those incredibly weighty interests? And my point, my response would be no. There is not a single case that either side has cited from the circuit where someone, in the context of political speech, where retaliating against them for that has been justified, has been found to tip the scale in the employer's favor. And so there's no reasonable employer in this context, no reasonable governmental employer would have any belief, would have any comfort level in the doctrine to say, okay, I disagree with him or with the way he is characterizing this DARE issue. I also disagree with him with the way he's characterizing the professionalism issue, and I think that's incorrect. And so I can fire him for that rather than, as Judge Duncan suggested, correcting the record. I disagree with my friend on the other side that this was a, that the DARE issue was hard to rectify. I thought the burden was on you, and I recognize you don't need to have a case directly on point, but I thought the burden was to show that there was a case, it would be helpful, a case that showed that what he was about to do, that is firing this officer, was unlawful. And again, I would point to all of the Durham v. Jones and the Smith v. Gilchrist case that say it's, and the cases that they rely on to say political speech is almost untouchable, and that in Smith v. Gilchrist, Durham v. Jones, you can't fire in those situations. I think, I accept that you have to have, it can't just be super generalized. So I accept this court's formulation of the question, Judge Traxler's, or Chief Judge Traxler's formulation of the question in Smith v. Gilchrist, because that was a big issue in Smith v. Gilchrist. It was a big issue, but it was different. It was external to the district attorney's office. It dealt with the efficacy of a driving school. It wasn't challenging the function of the district attorney's office, and it certainly didn't accuse the district attorney of misappropriation of funds. Yes, Your Honor. So again, I agree that every case is, like Your Honor said, super generous, but the point in Smith v. or in Gilchrist was when there's no evidence on the employer's side of the ledger that a reasonable apprehension of any change in the way the police department or the agency in question is going to operate, and that's my point here is there's nothing on the employer's side of the ledger to suggest that what Mr. Brickey said in these newspaper articles was going to change, in a negative way, the manner in which the police force operated. There's this generalized, in my opinion, unsubstantiated concern about morale and discipline. What evidence would advert to disruption of morale and discipline? What would need to be shown? I think you would have to have other officers questioning the authority of the chief. So some other officer has to put his career on the line, questioning his superior in order to show disruption? That seems a pretty unreasonable and unworkable standard. Well, I was giving an example, Your Honor. I think there has to be something other than just the chief's own belief that there is. Do you have a good example? Do I have a good example? Well, I thought the first one was. Apparently it wasn't. As people in the public questioning, oh, now, should we comply with these officers or should we support the police chief? And again, there was none of this. There was nothing in the record to suggest that either there was a lack of ability to enforce externally or a lack of ability to operate internally. Indeed, several of the officers hadn't even heard of these comments. The first time they heard of them was when Dr. Reynolds said, hey, did you hear about this? No. Okay, well, now that you've heard about it, what do you think? That's a pretty untenable position, too. And so there's nothing, our point, Your Honors, is there's nothing in the record to suggest that there was actual disruption or reasonable apprehension of disruption. Thank you, Your Honors. Thank you very much. Thank you. The balancing required in this case is complicated. And respectfully, we submit that requires judgment in favor of Chief Hall. As Judge Duncan mentioned, this is critical language. But is it critical enough? Well, that's a decision that Chief Hall has to weigh and make, and that's the type of balancing that, in a qualified immunity analysis, comes out in favor of the employer. There's allegations of misuse of funds, potentially, here. But at the time the termination decision is made, we know that those allegations are false. So when Chief Hall has to weigh those issues, that's the type of balancing that comes out, that's the type of analysis that, in a qualified immunity context, we respectfully submit comes out in favor of the employer. Given, and I used this phrase earlier, sweet spot, these types of comments don't rise to the Durham level. And that really hasn't been argued until today. If you look through the briefs, plaintiffs use terms like innocuous and vanilla to describe these comments. Now, today, they're arguing that they're about misconduct, and respectfully, they're false. And Chief Hall knew they were false at the time of the termination. And so they're not blessed with the type of protection that might come from Durham or the town of Mocksville. And that falsity carries over to the balancing test, and under the qualified immunity analysis, we respectfully submit that it comes out in favor of Chief Hall. And unless the Court has any questions, I ask that the Court would overturn Judge Conrad's decision. Thank you. Thank you very much. We will ask the Clerk to adjourn Court sine die and come down in group silence. This Honorable Court stands adjourned sine die. God save the United States and this Honorable Court.
judges: Allyson K. Duncan, Barbara Milano Keenan, Albert Diaz